# (March 15, 1984)

■ In the Matter of JOSEPH MILTON, Appellant, v JOSEPH J. CHRISTIAN, as Chairman of the New York City Housing Authority, Respondent. — Order and judgment (one paper) of the Supreme Court, New York County (T. Galligan, J.), entered December 2, 1982, dismissing petitioner CPLR article 78 proceeding, in which petitioner sought to annul a determination of respondent Joseph Christian, as Chairman of the New York City Housing Authority, which found petitioner ineligible for continued occupancy in the premises owned and operated by respondent on the ground petitioner is a nondesirable tenant, modified, on the law, to the extent of vacating the penalty and remanding the matter to the respondent for reconsideration of the penalty imposed, and the order and judgment is otherwise affirmed, without costs. ¶ Petitioner has been a tenant at the Walt Whitman Houses in Brooklyn, a New York City Housing Authority project, for more than 16 years. ¶ On February 10, 1982, respondent determined petitioner ineligible for continued occupancy in public housing on the ground of nondesirability. Respondent's determination followed a hearing held on February 3, 1981 and March 10, 1981. ¶ Respondent's evidence at the hearing indicated that on the first incident date, February 23, 1979, petitioner was served with a dispossess notice for nonpayment of rent by Housing Assistant Richard Schultz. Schultz testified that petitioner told him that he had friends in the area and that Schultz had better "watch out". ¶ In the second incident, respondent's testimony indicated that petitioner called Schultz a "white son of a bitch" and "white racist" who "would be taken care of". This altercation came as a result of petitioner's efforts to have a plasterer come to his apartment. Others intervened to remove petitioner. ¶ The third incident, which served as a basis for both the third and fourth specifications against petitioner, involved an incident where petitioner verbally abused Clarence Williams, a maintenance worker, and two others, in a dispute concerning the failure of the maintenance staff to repair an extensive leak in petitioner's apartment. According to Mr. Williams' version, petitioner on this occasion struck him in his face, knocking him to the ground. ¶ Petitioner

testified at the hearing. He explained that he had been under extreme physical and emotional stress during the period during which the three above incidents occurred. On November 18, 1978, petitioner was struck down by a truck while working at his job as an assistant dietician in Creedmoor State Hospital, which rendered him unable to work and forced him to apply for workers' compensation. Petitioner sustained a broken elbow and finger, a sprained back and a head laceration. At the time of the hearing, almost three years later, petitioner was still seeing an orthopedic surgeon and a neurosurgeon once a month. Due to bureaucratic difficulties with workers' compensation, petitioner apparently fell behind in the rent. During this period his wife of 12 years and his child left him. Further, his apartment began to seriously deteriorate, the worst problem being a severe leak which he was unable to handle himself because of his painful back. The leak was so severe that it flooded a neighbor's apartment, who furiously complained to petitioner. ¶ In respect to the specific incidents charged, petitioner testified that on February 23, 1979, Mr. Schultz and Mr. Raleigh did serve him with nonpayment of rent papers. He did not remember threatening the men. He did remember explaining to Mr. Schultz that he could not go on welfare until he had exhausted his workers' compensation. ¶ Petitioner conceded that on August 24, 1979, he did speak to Mr. Schultz in a loud voice because he "was in pain" and "tired of mopping water and sweeping up plaster * * * tired of seeing [his] clothes and [his] furniture ruined by water * * * tired of the people downstairs knocking on [his] door telling [him] * * * to mop up water because their stuff was being ruined downstairs. And [he] just didn't know what to do anymore". However, petitioner testified that he and Mr. Schultz did mutually apologize to one another immediately following the incident. ¶ Petitioner explained that after the third incident, precipitated by torrential leaks in his apartment which caused him to be awakened at 5:00 A.M. by angry neighbors complaining of a cascading leak, he commenced mopping for approximately two hours until he could no longer continue due to pain in his back and arm. He then sought help from the maintenance staff, which led to an argument with Clarence Williams. Petitioner testified that during this altercation Mr. Williams pulled out a knife and actually cut petitioner's jacket. Although the police arrived on the scene, no one was arrested. ¶ The hearing officer, in his decision dated January 13, 1982, recommended termination of petitioner's tenancy. He found, as trier of the facts, that petitioner was the aggressor in all three incidents in issue, not, however, "because of any personal animus or hostility toward either Mr. Schultz or Mr. Williams, but rather as best stated by Tenant himself, because of his personal misery due to the pain and disability from the accident, the separation from his wife and child, the loss of his job, the delay in receiving workmen's compensation benefits, the deteriorating condition of his apartment about which nothing was being done by the landlord, and 'not knowing where to turn' and 'with everything going down the tubes.'" The hearing officer further took "a very dim view of the use by Mr. Williams of a knife * * * particularly where, as in the instant case, he concedes that Tenant's first blow did not involve too much force, and it appears that he could have avoided further confrontation". ¶ On February 10, 1982, the respondent authority adopted the hearing officer's decision and determined petitioner to be ineligible for continued occupancy. Petitioner commenced this proceeding challenging that determination on April 22, 1982, and Special Term dismissed the petition. ¶ It is true that it is not the duty of a court to substitute its judgment for that of an administrative agency (see *Matter of Stork Rest. v Boland,* 282 NY 256, 267). However, the punishment of terminating petitioner's tenancy of almost 16 years under the circumstances herein was " ' "so disproportionate to the offense, in the light of all the circumstances, as to be shocking to one's

sense of fairness".'" (*Matter of Pell v Board of Educ.*, 34 NY2d 222, 233.) ¶ The three incidents set out above occurred during an eight-month period when Mr. Milton was undergoing an extremely stressful period in his life including a work-related accident causing him to lose his employment, severe indebtedness, and the abandonment by his wife, who took his daughter. In addition, severe leaks occurred in his apartment which the respondent authority did not repair despite frequent requests to do so. The first two of the three incidents involved verbal altercations concerning payment of rent and the neglect of the respondent authority to repair his apartment. In the one incident in which Mr. Williams, a maintenance man, was struck by petitioner, the hearing officer found that Williams had pulled a knife on petitioner. ¶ It would appear a more appropriate penalty would be a period of probation for petitioner. However, we remand for reconsideration by the respondent authority to determine the exact nature of such penalty (see *Rob Tess Rest. Corp. v New York State Liq. Auth.*, 49 NY2d 874). Concur — Carro, Asch and Milonas, JJ.

Murphy, P. J., dissents in a memorandum as follows: I would affirm for the reasons stated by Justice Galligan at Special Term. While the petitioner may have been experiencing difficulties in his personal life, these problems in no way excuse his verbal and physical misbehavior on the three occasions recounted in the majority memorandum (*Matter of Jones v New York City Housing Auth.*, 60 AD2d 812). If petitioner Milton is permitted to commit flagrant violations with impunity, the Housing Authority has little hope of maintaining order in the Walt Whitman Houses. The severe sanction of eviction was warranted in this proceeding to deter similar misconduct and to permit other residents to enjoy their tenancy in both the short and the long term.